UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JULIA STEWART,

                 Plaintiff,                          Case No. 1:22-cv-10766

v.                                         Honorable Thomas L. Ludington
                                          United States District Judge

COUNTY OF SAGINAW,

                  Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DISMISSING PLAINTIFF'S COMPLAINT, AND DENYING DEFENDANT'S MOTION TO ADJOURN SCHEDULING ORDER AS MOOT**

Plaintiff Julia Stewart—a white woman—worked as the 70th District Court of Saginaw County Traffic Division Supervisor from 2017 until she resigned in early 2022. In January 2021, Valerie Baker—a Black woman, who worked as a 70th District Court clerk—called Plaintiff's office. Although the exact language and underlying rationale are disputed, Plaintiff answered the phone by referring to Baker as a "chocolate chip" or "chocolate chip cookie." Baker filed an internal complaint with Saginaw County's Personnel Department, which referred the complaint to external investigator and private attorney Tobin Dust, who in turn concluded Plaintiff violated County racial discrimination and harassment policy. Plaintiff was suspended for three days without pay, and was required to attend sensitivity training.

In April 2021, when Plaintiff returned to work after serving her three-day suspension, the Traffic Division she oversaw was in turmoil. Several of her subordinates filed internal complaints alleging Plaintiff created a toxic work environment and made additional racist comments towards her Black subordinate employees, including telling one of her subordinates—a Black woman—to "chop chop monkey" as the subordinate employee was leaving the office sometime in 2019.

Plaintiff disputes most allegations within her subordinates' internal complaints, and alleges they were prompted by her discipline for the chocolate chip cookie incident, which she believes "branded her a racist" within the Traffic Division. Indeed, in addition to the harassment Plaintiff's subordinates complained of, Plaintiff complained she was harassed, too. In December 2021, Plaintiff filed her own internal complaint alleging her subordinate employees referred to her as "white devil" and "white trash." One month after filing her internal complaint, though, Plaintiff asked if she could withdraw it. And one month later, Plaintiff resigned.

In April 2022, two months after resigning, Plaintiff sued Defendant Saginaw County, alleging it discriminated against her on the basis of her race, and unlawfully retaliated against her, by constructively terminating her employment in violation of the Fourteenth Amendment, Michigan's Elliott-Larsen Civil Rights Act, and Michigan's Whistleblowers' Protection Act. Currently before the Court is Defendant's Motion for Summary Judgment, which, as explained below, will be granted in full. Largely because Plaintiff has not shown a prima facie case of reverse discrimination, nor an adverse employment action of constructive discharge, her Complaint will be dismissed.

## I.

### A. Plaintiff's Early Employment and Evaluations

Michigan's 70th District Court, based in Saginaw County, is organized into a Civil Division, a Criminal Division, a Probate Division, and a Traffic Division. ECF No. 19-3 at PageID.199. This racial discrimination case involves the Traffic Division which, after what has been referred to as the "chocolate chip cookie incident" in 2021, was described by its employees as a "hostile," "uncomfortable," "stressful," and "explosive" place to work. *See*, *e.g.*, ECF Nos. 19-7 at PageID.271, 19-19 at PageID.339–40; 19-20 at PageID.353, 355; 19-21 at PageID.360;

19-25 at PageID.383; 19-27 at PageID.388; 22-8 at PageID.761.

Before the chocolate chip cookie incident and the alleged hostility it produced, Plaintiff Julia Stewart—a white woman—was hired as the Traffic Division's assistant supervisor in September 2017. ECF No. 22-3 at PageID.749. Nearly three months later, Plaintiff was promoted to serve as Traffic Division Supervisor. ECF Nos. 19-2 at PageID.178; 19-3 at PageID.194. In this role, Plaintiff directly reported to Court Administrator Linda James, who is also a white woman. ECF No. 19-3 at pageID.199–200. As Supervisor, Plaintiff oversaw the work of Traffic Division Assistant Supervisor Kelly Carroll—a white woman—*id.* at PageID.199, and numerous traffic clerks including Michelle Boruszewski, Tammy Bieszke, Kanisha Jones, Ellie Hamme, Sue Sawyer, Melissa Ray, and Linda Burgess. ECF No. 19-3 at PageID.199–201.

From her promotion to Supervisor in late 2017 through 2020, Plaintiff generally received excellent performance reviews. In September 2018, Linda James reported Plaintiff achieved or exceeded all expectations, "ha[d] quickly learned many aspects of the Traffic Division in the first year of her employment," was dependable and needed "limited supervision," and "work[ed] well wither her staff." ECF No. 22-6 at PageID.756–57. In September 2019, Linda James again reported that Plaintiff achieved or exceeded all expectations, "strive[d] to make her department a better environment [and] improve the workflow." *Id.* at PageID.754–55. Plaintiff's annual evaluation in September 2020 was no different. Linda James indicated Plaintiff achieved or exceeded all expectations and "continue[d] to work well with her staff keeping them motivated." *Id.* at PageID.752–53.

### B. The "Chocolate Chip Cookie Incident"

Then came the "chocolate chip cookie incident." On January 14, 2021, Valerie Baker—a clerk to District Court Judge Alfred Thomas Frank—called Plaintiff's office phone. ECF No. 19-

3 at PageID.202. What happened next is disputed, as reflected by the following recollections:

> (1) Assistant Supervisor Kelly Carroll, who was in the room with Plaintiff when Plaintiff answered Baker's call, believes Plaintiff answered the phone by saying "Hi, chocolate chip" or "[h]ey chocolate chip!" *See* ECF Nos. 19-7 at PageID.269–71; 19-9 at PageID.344.

> (2) Baker believes Plaintiff answered her phone call by exclaiming "What's up[,] [c]hocolate chip?" ECF No. 19-9 at PageID.299.

> (3) Plaintiff first reported she answered the phone by saying "hello, Chocolate Chip Cookie" and was referring to a joke in which Plaintiff would ask her colleagues for cookies in exchange for helping them with favors. ECF No. 19-6 at PageID.266. During her deposition, Plaintiff testified that she answered Baker's call by saying "it'll be a chocolate chip cookie" but admitted her earlier report is more reliable. ECF No. 19-3 at PageID.202–03, 207. Notably, although Plaintiff maintains she was merely referencing an inside joke, Baker reported the two "did not have a relationship where they would typically joke or engage in humor." ECF No. 19-8 at PageID.286.

Although the precise language of Plaintiff's remark is disputed, the fact that Plaintiff immediately referenced a "chocolate chip" or "chocolate chip cookie" when answering Baker's call is not disputed. And it is not disputed that Baker—a Black woman—was offended by Plaintiff's comment and believed it to be racist. ECF No. 19-3 at PageID.201, 208; 19-9 at PageID.300.

On January 15, 2021, Baker went to Court Administrator Linda James's office and explained the incident to her. ECF No. 19-4 at PageID.236–37. Linda James then went to Plaintiff's office and told her that Baker was offended by her chocolate chip remark. *Id.* at PageID.237. Plaintiff told Linda James that she did not intend to offend Baker and offered to "immediately" apologize. *Id.* The wording of Plaintiff's apology is also disputed, but the apology indisputably made matters worse. Plaintiff recalls that she genuinely apologized for the remark, explained it was in reference to her "ongoing joke" and thanked Baker for reporting the issue to Linda "because [Plaintiff] felt like [Baker] and [Plaintiff] really built a good relationship" and because Plaintiff wouldn't have been able to remedy the situation if it was never brought to her

attention. ECF No. 19-3 at PageID.203. Baker saw things differently. Although Baker noted Plaintiff apologized for the remark, Baker recalls Plaintiff justified it by saying "she [frequently] makes chocolate chip cookies for the Traffic Division" and "had chocolate chip cookies on her mind." ECF No. 19-9 at PageID.300. Baker reported that she felt Plaintiff was sarcastic and insincere when "thanking" her for reporting the issue to Linda James and claims Plaintiff merely said, as she was leaving Baker's office, "[o]h and thanks for going to Linda." *Id.* Notably, the only other witness to this apology was Sheila Danley—a court reporter who sat five-to-six feet away from Baker. ECF No. 19-8 at PageID.293–94. Danley shared Baker's view that Plaintiff's "explanation was nonsense and that the so-called thank you" was sarcastic and insincere. *Id.* at PageID.294.

Baker then filed a formal complaint with the Saginaw County Personnel Department, which oversaw human resources for the 70th District Court. *See* ECF No. 19-9 at PageID.300; *see also* ECF No. 19-11 at PageID.311. Baker's complaint was received by Personnel Director Jennifer Broadfoot and County Controller Robert Belleman. ECF No. 19-10 at PageID.302–04. Broadfoot and Belleman reviewed Baker's complaint and referred it to outside investigator and private attorney Tobin Dust. ECF No. 19-3 at PageID.200.

Throughout his investigation, Dust reviewed Baker's complaint, ECF No. 19-9; Plaintiff's written response, ECF No. 19-8 at PageID.297; and relevant Saginaw County policies, ECF No. 19-11. ECF No. 19-8 at PageID.282. Dust also interviewed Plaintiff, Linda James, Sheila Danley, and Baker on two separate occasions.[1] *Id.* Dust's investigation reached two conclusions. First, Dust

---

[1] During an interview with Dust, Baker reported that, two weeks after Plaintiff apologized for the chocolate chip remark, Plaintiff offered Baker a piece of white cake and "emphasized the word white" when doing so. ECF No. 19-8 at PageID.287. Plaintiff acknowledged that she offered Baker cake that day but "could not recall" whether she described the cake as "white" or emphasized the word. *Id.* at PageID.291.

concluded that, although Plaintiff "probably did not intend her statement to be injurious[,]" her chocolate chip remark referred to Baker and likely referred to her race, in violation of Saginaw County Personnel Policy which prohibits racial harassment and discrimination.[2] *Id.* at PageID.282–83. Notably, Dust explained this conclusion was based, in part, on Plaintiff's inconsistent and "bizarre" explanations about the remark. *Id.* at PageID.283, 290 (noting Plaintiff "became flustered" and could not clearly answer Dust's questions about Plaintiff's intent). Second, Dust concluded that Plaintiff's subsequent apology to Baker was "likely not sincere" and also violated Saginaw County Policy which prohibits retaliation against an employee for asserting a discrimination or harassment claim. *Id.*

Accordingly, Dust recommended Plaintiff be disciplined by requiring sensitivity training. *Id.* at PageID.283. Dust compiled his conclusions and recommendations in a report, which was sent to Broadfoot and Belleman on February 15, 2021. *See id.* at PageID.282. Broadfoot and Belleman then worked with 70th District Court Judge Elian Fichtner and Saginaw County Chief Judge Darnell Jackson to determine the appropriate discipline Plaintiff should receive.[3] *See* ECF No. 19-13 at PageID.319–21. The group decided to take a "three-prong approach" to Plaintiff's discipline. *Id.* at PageID.321.

---

[2] Dust concluded Plaintiff's *chocolate chip remark* violated Saginaw County Personnel Policy Nos. 321 and 322. ECF No. 19-8 at PageID.282. Policy No. 321, entitled "standards of conduct" prohibits "[o]ffensive conduct and/or offensive language, including sexual and/or racial harassment towards person(s) in the workplace[.]" ECF No. 19-12 at PageID.314–15. Policy No. 322 prohibits sexual harassment, racial discrimination, and retaliation. ECF No. 19-11 at PageID.310. In pertinent part, Policy No. 322 warns "[a]ny employee found to have . . . unlawfully discriminated against another employee or to have retaliated against an employee for making a complaint of discrimination . . . will be subject to discipline[.]" *Id.* Dust concluded Plaintiff's *apology* violated this provision of Policy No. 322, too. ECF No. 19-8 at PageID.282.

[3] Although Judge Jackson served as the Saginaw County Chief Judge at the time and was generally responsible for employee discipline within the court, he "delegated the administration of [Baker's] complaint to . . . Judge Fichtner[.]" ECF No. 19 at PageID.154; *see also* ECF No. 19-13 at PageID.320.

On March 26, 2021, Judge Fichtner sent Plaintiff a letter informing her that, "[a]s a result of [Dust's] investigation," Plaintiff was (1) suspended for three days; (2) required to read and review the provisions of the Saginaw County Personnel Policy she violated; and (3) "required to attend diversity training programs." ECF No. 19-14 at PageID.326–27. Plaintiff served her three-day suspension, without pay, from March 29–31, 2021. *See* ECF No. 19-3 at PageID.206. While suspended, Plaintiff voluntarily enrolled in and completed an unidentified online diversity-training course. *Id.* at PageID.188. But the 70th District Court never directed Plaintiff to enroll in this particular course, and "wouldn't accept" her completion of it. *Id.* Plaintiff claims she "was never given" specific training, despite requesting it "numerous times." *Id.* at PageID.211.

On March 29, 2021, as she was serving her suspension, Plaintiff and her manager's union representatives filed a grievance challenging the suspension, arguing in part that Dust's investigation violated County Policy requiring *two* staff members to investigate discrimination complaints.[4] ECF No. 19-15 at PageID.329. In accordance with step one and two of the grievance process established by the Plaintiff's Collective Bargaining Agreement (CBA), ECF No. 19-36, Plaintiff's grievance was sent to Court Administrator Linda James. ECF No. 19-3 at PageID.209 (noting, at step one, Plaintiff had an in-person conversation with James and, at step two, formalized her grievance in writing and sent it to James). Linda James received Plaintiff's grievance on April 14, 2021 and denied it, noting Plaintiff's discipline was "justified." ECF No. 19-16 at PageID.332. In accordance with step three of the grievance process, Plaintiff and her union representatives met with 70th District Court officials on May, 20, 2021. ECF No. 19-17 at PageID.335. In attempt to

---

[4] Saginaw County Personnel Policy No. 322 provides that the County Controller "shall designate two (2) County staff persons, one male and one female, to receive, investigate, and resolve complaints." ECF No. 19-11 at PageID.311. Personnel Director Broadfoot maintains this policy was followed in Plaintiff's case because she and Robert Belleman oversaw Dust's investigation and were "involved in the processing" of Baker's complaint. ECF No. 19-10 at PageID.303–04.

settle the dispute, Plaintiff's union representatives suggested that Plaintiff would accept a "written reprimand" so long as the suspension was vacated. *See id.* But the 70th District Court rejected this offer, noted Plaintiff's discipline "was warranted as issued," and denied Plaintiff's grievance again on June 3, 2021. *Id.*

### C. Plaintiff's Return to Work and Subordinate Complaints

Plaintiff alleges that things changed when she returned to the Traffic Division after serving her suspension, and maintains that the discipline she received for her chocolate chip comment "branded [her] a racist" and "completely compromised [her] ability to run" the Division. ECF No. 1 at PageID.5–6.

Plaintiff alleges that, when she returned to work on April 1, 2021, Court Administrator Linda James immediately and sarcastically asked Plaintiff whether she "enjoy[ed]" her time off. ECF No. 19-3 at PageID.231. Linda James notes she "may have made" this statement "just to create small talk." ECF No. 19-4 at PageID.242.

In addition to this one-off comment from her supervisor, several of Plaintiff's subordinates soon after filed internal complaints against Plaintiff, alleging that Plaintiff made additional discriminatory remarks to Traffic Division employees throughout her time as Supervisor, and generally created a hostile work environment. Plaintiff maintains these complaints were part of a "concerted" effort by her subordinates to "paint Plaintiff as a racist" and force her resignation. *See* ECF No. 22 at PageID.672, n. 2. Each complaint will be discussed in turn.

### 1. Kanisha Jones's Fist Complaint

On March 24, 2021, traffic clerk Kanisha Jones filed a complaint with the Saginaw County Personnel Department. ECF No. 22-13. Notably, this complaint was filed before Plaintiff was suspended for her chocolate chip comment and did not concern Plaintiff directly. Instead, Jones

complained that two other clerks—Ellie Hamme and Michelle Boruszewski—were unprofessional and creating a negative work environment. *Id.* at PageID.788. But Jones noted Plaintiff was "fully aware" of these issues and was addressing them. *See id.* at PageID.788–94 (noting Plaintiff "does want everyone to get along at work"); *see also* ECF No. 19-5 at PageID.257.

Jones met with Personnel Specialist April Key, who determined Jones's complaint did not allege any violations of Saginaw County policy or procedure. ECF No. 19-18 at PagerID.337. Key additionally concluded that the matter was "resolved" in part because Plaintiff "dealt with the issues and put some new procedures in place." *Id.*

### 2. Kelly Carroll's First Complaint

Assistant Traffic Supervisor Kelly Carroll filed her first complaint on April 10, 2021. ECF No. 19-19 at PageID.339. Carroll claimed the Traffic Division was "hostile, unprofessional, uncomfortable, stressful, humiliating, and threatening." *Id.* Carroll complained she was "stalked" and "harassed" by Hamme and Boruszewski "on several occasions." *Id.* Carroll alleged that Plaintiff was friends with Hamme and Boruszewski, and favored them over other traffic division employees. *Id.* at PageID.339 ("[Plaintiff] hangs out with Ellie Hamme and Michelle Bor[u]szewski on the weekends . . . I believe that due to their friendship this is why [Plaintiff] will not correct Ellie and Michelle and sides with them and bull[ies] myself and Kanish Jones and Tammy Bieszke."), PageID.340 ("[Plaintiff] will become loud and rude with her other employees but will show such obvious favoritism with Ellie and Michelle."), PageID.347 ("[Plaintiff] hangs out with . . . Ellie and Michelle out[side] of work . . . I think this is why [Plaintiff] will not correct them and protects [them]. . . . It is so obvious that it makes the rest of us feel very uncomfortable and now it has turned into actual stalking and harassment."). Aside from the alleged favoritism, Carroll complained Plaintiff intentionally embarrassed her and "verbally attacked" her "so many

times in front of the whole department" in a "rude, hostile, and down right nasty" manner. *Id.* at PageID.341.

### 3. Tammy Bieszke's Complaint

About three days after Carroll filed her first complaint, traffic clerk Tammy Bieszke filed a complaint of her own. ECF No. 19-20; *see also* ECF No. 19-21 at PageID.359 (noting Bieszke's complaint was filed around April 13, 2021). Similar to Carroll's complaint, Bieszke's alleged Hamme and Boruszewski were rude to, harassed, and stalked other Traffic Division employees. *Id.* at PageID.350–53. Bieszke also complained, that Hamme, Boruszewski, and Plaintiff were racist, especially towards Kanisha Jones. *Id.* at PageID.353.

Bieszke filed a "[p]art two" to her complaint sometime after April 15, 2021, and sometime after the Traffic Division "me[t] and talked with" Court Administrator Linda James. *Id.* at PageID.354; ECF No. 19-21 at PageID.260. Bieszke added allegations that Plaintiff slammed doors throughout the office and created a hostile and uncomfortable work environment. ECF No. 19-20 at PageID.354–55.

### 4. Kelly Carroll's Second Complaint

Assistant Traffic Supervisor Kelly Carroll filed a second complaint on April 17, 2021— one week after she filed her first complaint. ECF No. 19-22 at PageID.364. Carroll's second complaint alleged Plaintiff retaliated against her for filing her first complaint and was becoming "even more hostile, aggressive, [and] unprofessional" to the point that Carroll feared for her life. *Id.* at PageID.364, 367 ("I fear that [Plaintiff will] bring[] a gun in here and mow us all down."). Notably, though, the only evidence supporting Carrol's claim that Plaintiff was becoming more hostile and aggressive was that Plaintiff would stomp her feet and slam doors throughout the office, similar to the allegations within "part two" of Bieszke's complaint. *See id.* at PageID.364–65.

- 10 -

Carroll also noted her belief that Plaintiff "is a racist person" and alleged Plaintiff bullied Carroll and Bieszke—who are both white woman—solely because they were friends with Jones—who is a Black woman. *Id.* at PageID.366. On this point, Carroll recalled the chocolate chip incident and additionally alleged Plaintiff, at some point in the past, said "chop chop monkey" to Kanisha Jones. *Id.*

Plaintiff concedes that, at some unidentified point, she said "chop chop monkey" to some Traffic Division employee. ECF No. 19-3 at PageID.217–218. But Plaintiff does not believe she said this to Jones, and does not believe she made this remark towards a Black employee. *Id.* at PageID.218. Kanisha Jones recalls things differently, and claims Plaintiff directed the "chop chop monkey" comment solely at her. ECF No. 19-5 at PageID.260. Indeed, Jones recalls Plaintiff said "chop chop monkey" as Jones was getting ready to leave the office, and Jones expressly told Plaintiff to stop. *Id.* at PageID.260–61. Kelly Carroll and Tammy Bieszke also recall hearing Plaintiff say "chop chop monkey" to Jones, as Jones was preparing to leave the office, although neither remember when the comment was made. ECF Nos. 19-7 at PageID.278–79. 19-21 at PageID.362. Bieszke recalls Plaintiff made the comment "a few times" throughout "a few days." ECF No. 19-21 at PageID.362.

### 5. Kanisha Jones's Second Complaint

Kanisha Jones filed her second complaint on November 15, 2021, more than six months after the flurry of complaints discussed above. ECF No. 19-27. Unlike her first complaint, which was primarily directed at Hamme and Boruszewski, Jones's second complaint concerned Plaintiff. *Id.* Jones complained that Plaintiff, likely sometime in 2019, "jokingly" told her, in front of the Traffic Division, multiple times, "chop chop monkey let's go." *Id.* at PageID.388; ECF No. 19-5 at PageID.261. Jones also alleged Plaintiff racially harassed her by asking, at some unidentified

point in time, whether Jones would be offended if Plaintiff asked her a question. ECF No. 19-27 at PageID.387. Jones responded "[o]kay . . . [d]epends on what the question is." ECF No. 19-5 at PageID.260. Plaintiff then asked Jones, in front of other Traffic Division employees, what products she used to care for her hair, because Plaintiff's granddaughter is Black, like Jones. *Id.*; ECF No. 19-3 at PageID.218. Jones was offended because she did not have children and did not understand why Plaintiff would ask her this question in front other employees, especially when Plaintiff first indicated the question may have been offensive. ECF Nos. 19-27 at PageID.387; 19-5 at PageID.260.

On December 1, 2021, Court Administrator Linda James informed Plaintiff about Jones's complaint and told her it would be investigated by Tobin Dust. ECF No. 19-3 at PageID.225. On this point, Plaintiff claims Linda James also told her that the environment at the Division was "not going to get any better" and that Plaintiff would have to "fight the fight." *Id.* Plaintiff filed a written response to Jones's complaint the next day, on December 2, 2021. ECF No. 19-29. In her written response, Plaintiff admitted to asking Jones about her hair products, explained the division frequently talked about hair, and noted that Jones "started the conversation about her hair and curls" the day in question. *Id.* at PageID.400.

Jones's second complaint was referred to Tobin Dust for investigation but he did not write or file a final report because Plaintiff resigned during the investigation, as explained in greater detail *infra* Section I.E. *See* ECF No. 19-28 at PageID.393–98.

### D. Employee Meetings

In response to these and other formal and informal complaints, Court Administrator Linda James and Judge Clark attended a Traffic Division meeting in November 2021. ECF No. 22-19 at PageID.827. Abruptly, Traffic Division employees "open[ed] up and share[d] all their ill feelings

and dislikes." *Id.* So, Linda James and Judge Clark met with each employee individually throughout the rest of the month. *Id.*

On November 4, 2021, Linda James and Judge Clark met with Assistant Supervisor Kelly Carroll who noted that Plaintiff "doesn't keep complaints confidential," was a "tumor" within the Division, and favors certain employees over others. *Id.*

On November 5, 2021, Linda James and Judge Clark met with clerk Sue Sawyer who reported that Plaintiff's subordinates referred to her as "evil" and often commented "evil people walk in heels" when Plaintiff was wearing high heels in the office. *See id.*; *see also* ECF No. 1 at PageID.6. Sawyer also shared the following Facebook post by Kelly Carroll:

> The worst type of person is one who puts on a mask to everyone but behind that mask is a manipulative conniving fake phony evil bitch that wants nothing more than to feel empowered and relevant by sabotaging and destroying other people so that everyone doesn't figure out who they truly are. This is my life every damn day. When does it stop. When does everyone see this person for what they are. The devil is busy but never tired.

ECF No. 19-26; *see also* ECF No. 22-19 at PageID.827. Sawyer told Linda James and Judge Clark that Carroll wanted to "kick [Plaintiff] out" and get Plaintiff "out of the picture" so Carroll could become the Traffic Division Supervisor. *Id.* Also on November 5, Linda  James met with Kanisha Jones who "stated that [Plaintiff] is the problem" and that "Sawyer is being treated [by Plaintiff] as if she is management." *Id.* at PageID.828

On November 8, 2021, Linda James and Judge Clark met with traffic cashier Linda Burgess who reported that Plaintiff favored certain employees, such as Sue Sawyer, and was generally "harsh and demeaning." *Id.*

On November 9, 2021, Linda James issued Kelly Carroll a written reprimand for her Facebook post because Carroll admitted the post referred to Plaintiff and James concluded it

violated the 70th District Court's code of conduct.[5] *Id.*; ECF No. 22-8 at PageID.773. Also on November 9, 2021, Linda James and Judge Clark met with Traffic Clerk Tammy Bieszke who noted Plaintiff "ma[de] nasty remarks" and "br[ought] a lot of personal matters to work which affect[ed] her mood." 22-19 at PageID.828. Linda James and Judge Clark also met with a woman who worked in the Traffic Division, under Plaintiff's supervision, for two months. *Id.* The former employee recalled that she immediately noticed tension within the Department and stated Plaintiff "talk[ed] down to people." *Id.*

On November 10, 2021, Linda James and Judge Clark met with Kanisha Jones, who alleged Plaintiff was harassing her and was not sufficiently addressing subordinate complaints. *See id.*

On November 15, 2021, Judge Clark and Linda James met with Plaintiff who denied playing favorites, said her subordinates were "oversensitive," and noted her fear that her subordinates were going to "set [her] up" by making false accusations. *Id.* at PageID.828–29. Plaintiff also reported Kanisha Jones referred to Plaintiff as "White Devil." *Id.* at PageID.829.

After her written summary of these meetings, Linda James noted that she and Judge Clark shared the conclusion that Plaintiff did not "have the necessary management style or personality to continue" as Supervisor of the Traffic Division. *Id.* Linda James noted that Plaintiff's performance was declining and that, "due to her management style" the Division was not attracting nor maintaining new employees. *Id.* Linda James concluded by noting, "[t]o avoid any more damage . . . [Plaintiff] should not return to work." *Id.* But nothing in the record suggests Linda

---

[5] When asked during deposition why Carroll was only written up for her Facebook post while Plaintiff was suspended for her chocolate chip comment, Court Administrator Linda James explained the Court employed "progressive discipline" and Plaintiff was immediately suspended because her conduct and comment were more severe than Carroll's post. ECF No. 22-8 at PageID.773. When asked why this post was not referred to Tobin Dust or another external investigator, Linda James explained there was no need for an independent investigation because Carroll's post did not plausibly relate to race, unlike Plaintiff's chocolate chip cookie comment. *Id.*

James acted in accordance with these conclusions, nor shared them with Plaintiff or other staff members.

### E. Plaintiff's Complaint and Resignation

Plaintiff's subordinate employees were not the only ones experiencing tension and complaining about the environment within the Traffic Division. At the same time Plaintiff's subordinate employees claimed Plaintiff was harassing and discriminating against them, Plaintiff maintains her subordinate employees harassed and discriminated against her. ECF No. 19 at PageID.149; *see also* ECF No. 19-30.

On Sunday, November 7, 2021, Plaintiff wrote Linda James a letter explaining Plaintiff did "not feel safe" "due to prior accusations made about [her] and unknown accusations that may be made about [her] in the future." ECF No. 19-25 at PageID.383. Plaintiff referenced Kelly Carroll's Facebook post and explained her opinion that Carroll was to blame for the Traffic Division's hostility. *See id.* (stating "information discussed in confidential settings was being twisted and shared by a person in a management position" and that this "person" used this "twisted" and "confidential" information to undermine and target Plaintiff).

On December 2, 2021, Plaintiff called in sick. ECF No. 22-19 at PageID.829. On December 3, 2021, Plaintiff was placed on FLMA leave due to her high blood pressure. *See* ECF No. 19-3 at PageID.198

During her FMLA leave, Plaintiff applied and interviewed for other jobs. *See* ECF No. 19-3 at PageID.199. And, the same day she began her FMLA leave, Plaintiff filed a formal complaint with the County Personnel Department. ECF No. 19-31 at PageID.411. Plaintiff's internal complaint alleged that Carroll, Jones, and Bieszke "harassed [her], reported false allegations, retaliated against formal instructions, spread rumors, posted negative statements on social media

directed at [her], called [her] names and taunted [her]." *Id.* at PageID.409. Plaintiff's complaint specifically referenced Carroll's Facebook post, and alleged that Jones's second complaint was retaliatory and filed solely because Plaintiff had informally complained about Jones's "behavior and work ethic." *Id.* at PageID.410. Plaintiff further alleged that Kanisha Jones openly referred to herself, Kelly Carroll, and Tammy Bieszke as a "gang" and referred to Plaintiff as "[t]he White Devil" or white "trash." *Id.* at PageID.410–11. But, notably, Jones, Carroll, and Bieszke all deny referring to themselves as a "gang" and deny calling Plaintiff "white devil" or "white trash." ECF Nos. 19-5 at PageID.256–57, 259; 19-7 at PageID.274, 276; 19-21 at PageID.359, 361.

On December 22, 2021, Personnel Specialist April Key emailed Court Administrator Linda James a copy of Plaintiff's complaint. ECF No. 22–26. Key indicated that most of the complaint concerns "general personnel" issues but that Plaintiff's allegation that her subordinates called her the "white devil" would be referred to Tobin Dust, *id.* at PageID.857, because the County "recognized that [it] was an inappropriate comment, and . . . needed to be referred out for an investigation." ECF No. 19-10 at PageID.305.

But, on December 27, 2021, Plaintiff emailed April Key asking if she could "pull" her complaint because she thought withdrawing her complaint would be "best." ECF No. 19-33 at PageID.415. Key responded that Plaintiff could pull her complaint but, if she did, her allegations would not be investigated. *Id.* Plaintiff did not respond. ECF No. 19-3 at PageID.222. Although Plaintiff argues she only was asking if she had the *ability* to withdraw her complaint, ECF No. 22-2 at PageID.737, the County interpreted Plaintiff's initial email and lack of further communication as a request to withdraw her complaint. *See* ECF No. 19-10 at PageID.305.

Nevertheless, on January 10, 2022, Plaintiff extended her FMLA leave to February 3, 2022. *See* ECF No. 20 at PageID.655. But, on January 20, 2022, Plaintiff emailed Linda James that she

was resigning her employment, effective on February 3, 2022. ECF No. 19-35 at PageID.644.

### F. Procedural Posture

In April 2022, two months after she resigned, Plaintiff filed a Complaint alleging that Defendant Saginaw County discriminated against her on the basis of her race in violation of the Fourteenth Amendment and 42 U.S.C. § 1983 (Count I); discriminated against her on the basis of her race in violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MICH. COMP. LAWS § 37.2202(1)(a) (Count II); retaliated against her in violation of the ELCRA (Count III); and violated the Michigan Whistleblowers' Protection Act (WPA), MICH. COMP. LAWS § 15.361, *et seq.* (Count IV). *See generally* ECF No. 1. Currently before the Court is Defendant's Motion for Summary Judgment. ECF No. 19.

### II.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party, who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

When the moving party "also bears the burden of persuasion at trial, [its] 'initial summary

judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (quoting *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001)); *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) ("[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.") (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984) (emphasis omitted))).

## III.

Defendant seeks summary judgment on all of Plaintiff's claims. Each of Plaintiff's claims and Defendant's arguments will be addressed in turn.

### A. Plaintiff's Employer

Plaintiff worked for the Michigan's 70th District Court of Saginaw County. So who was Plaintiff's employer? The 70th District Court, the State of Michigan, Defendant Saginaw County, or some combination? More than mere semantics, this distinction may be dispositive. Plaintiff's employment discrimination claims against Defendant Saginaw County can only succeed if Defendant was, in fact, Plaintiff's employer. Defendant contends Plaintiff was employed by the State of Michigan, not Saginaw County, and, thus, Defendant is entitled to summary judgment on *all* claims. ECF No. 19 at PageID.160–63, 166–69. But Saginaw County paid Plaintiff, was identified as Plaintiff's employer on federal tax documents, and established and oversaw all personnel policies Plaintiff was subject to. Thus, a genuine question of material fact exists as to whether Defendant was, at least, Plaintiff's "co-employer," and Defendant is not entitled to

summary judgment on this ground.

**1.**

For most plaintiffs pursing employment discrimination claims, identifying their employer is a relatively simple task. But, for Michigan state court staff, the task is complicated by "the relationship between the state's trial courts and the local government units that fund their operation." *Turppa v. Cnty. of Montmorency*, 710 F. Supp. 2d 619, 620 (E.D. Mich. 2010) [hereinafter *Turppa I*]. As explained below, Michigan precedent emphasizes that its trial courts are creatures of the *state* rather than the counties or cities where each court is located. At the same time, Michigan trial courts depend on their respective municipalities for funding and staff support.

This issue has confounded Michigan appellate courts and courts within the Sixth Circuit for decades. *See Maat v. Cnty. of Ottawa*, No. 1:12-CV-1194, 2014 WL 1255981, at *11 (W.D. Mich. Mar. 26, 2014), *aff'd sub nom. Maat v. Cnty. of Ottawa*, 657 F. App'x 404 (6th Cir. 2016) ("There appears to be no settled law or legal framework to resolve this issue, and the courts that have addressed this issue have reached conflicting outcomes with little or no analysis."); *Jud. Att'ys Ass'n v. State*, 586 N.W.2d 894, 897 (Mich. 1998) ("There is no public environment in the state of Michigan more complex than the trial court [system]. [T]he Michigan Supreme Court has general supervisory control over . . . and is constitutionally responsible for the efficient and effective operation of all courts within the state court system, but the day-to-day operation of the state's trial courts is . . . dependent on over 150 separate local governmental units for the bulk of the operational funding for their courts.").

At bedrock, Michigan's constitution envisions "one court of justice" throughout all divisions and authorizes the state legislature to establish trial courts. *Judges of 74th Jud. Dist. v. Bay Cnty.*, 190 N.W.2d 219, 224 (Mich. 1971); MICH. CONST. art. XI, § 1. Accordingly, the

Michigan legislature divided the state into judicial districts consisting of smaller municipalities such as counties or cities, and placed one trial court within each district. *See* MICH. COMP. LAWS § 600.8101(1). In 1996, the Michigan Legislature passed Public Act 374 which "restructured the Michigan judiciary and reorganized the statutes governing" the state court system. *Turppa I* at 623. Among other provisions, the Act classified judicial staff—other than judges—as employees of the local government unit that funded their employment, rather than the state. *Id.*

But, in 1998, the Michigan Supreme Court held that these provisions violated the state constitution and the separation of powers doctrine. *Jud. Att'ys Ass'n*, 586 N.W.2d 894, 897–99 (Mich. 1998) (noting "the case law . . . has come to strongly affirm that the fundamental and ultimate responsibility for all aspects of court administration, including operations and personnel matters within the trial courts, resides within the inherent authority of the judicial branch" and, that "[t]he judicial branch is constitutionally accountable for the operation of the courts and for those who provide court services, and must therefore be the employer of court employees"); *see also* MICH. CONST. art. III, § 2 ("The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.").

Notably, the Michigan Supreme Court did not discount the practical reality that state courts depend on the municipalities they are located in for funding, and personnel and administrative oversight.[6] *See Jud. Att'ys Ass'n*, 586 N.W.2d 894, 899 (Mich. 1998). But the Michigan Supreme

---

[6] Currently, nearly 45% of Michigan's state court system is funded by the local government entities where each court sits, whereas the state itself only contributes 25%. MICHIGAN JUDICIAL COUNCIL, ALTERNATIVE FUNDING FOR TRIAL COURTS WORKGROUP REPORT AND RECOMMENDA TIONS 8–9 (Nov. 2023), https://www. courts.michigan.gov/4929ac/siteassets/committees,-boards-special-initiatves/michigan-judicial-council/alt-trial-court-funding-final-report.pdf [https://perma .cc/NES6-QK6J] [hereinafter MJC Report]. Additionally, nearly 1/3 of Michigan's state court system ($418 million, annually) is funded by costs imposed on convicted criminal defendants. *Id.* This funding model has been widely criticized for "perpetuat[ing] inefficient, inconsistent, and

Court stressed that this dependency "cannot, as a constitutional matter, be used as an excuse to diminish the judiciary's *essential* authority over its own personnel." *Id.* (emphasis added).

Yet, simultaneous to this decision, the Michigan Supreme Court promulgated Administrative Order 1998-5 which seemingly minimized the state courts' "essential" authority over its personnel. The Order "emphasize[d] that funding trial courts is primarily the responsibility of the local government entity where the court is located, and set[] limits on the ability of chief judges to create new positions, promote employees, and enter into long term" wage and benefit agreements. *Turppa I* at 627. The Order also created local court-management councils comprised of representatives both from the judiciary and the funding municipality to set and enforce policies for state court staff. *Id.* In the absence of a management council, the chief judge was empowered to establish personnel policies, so long as the funding municipality was consulted in the process and any promulgated policy was consistent with similar policies of the municipality. *Id.*

This Court has recognized "[t]wo important themes" from this convoluted background: (1) "Michigan's constitutional provisions guaranteeing three separate and independent branches of government mean that the legislative branch cannot constitutionally mandate" that state court staff "become employees of the local government unit that funds their position[;]" and (2) despite this limitation on the state legislature, "individual judges may delegate some of the managerial and administrative duties relating to hiring, firing, and compensating judicial workers to local

---

unstable court operations;" "reduc[ing] public trust in the courts;" and "disproportionately affect[ing] vulnerable populations." MJC Report at 8–9. Indeed, the ACLU of Michigan and other community groups have challenged Michigan's funding model as unconstitutional. *See Funding Michigan's Court System*, ACLU OF MICH., https://www.aclumich.org/en/cases/ funding-michigans-court-system (last visited May 14, 2024) [https://perma.cc/D77J-5WCU]. And the Michigan Judicial Counsel—established by the Michigan Supreme Court to make recommendations on improving state courts—recognizing the merits of these claims, has recommended a complete "rebalancing" of state and local funding sources to ensure the state contributes "proportional" funds. MJC Report at 12–14.

administrators" and are even "encouraged by the Michigan Supreme Court to adopt counties' personnel policies . . . unless there is a good reason to deviate." *Id.* at 628.

## 2.

The undersigned's 2010 decisions in *Turppa v. Montmorency County* illustrate how Michigan's "hybrid" Court system muddles employment discrimination claims brought by state court staff, and largely control the analysis here, on analogous facts.

In *Turppa I*, a Montmorency County Probate Court register sued Montmorency County alleging it discriminated against her on the basis of her age by terminating her employment, in violation of the federal Age Discrimination in Employment Act and Michigan's ELCRA. *Id.* at 620. Montmorency County filed a motion to dismiss arguing—like Defendant Saginaw County here—that the plaintiff was a *state* employee and, thus, the County should be dismissed. *Id.* This Court, after thoroughly explaining the "hybrid" nature of Michigan's state court system, recognized that, in certain employment discrimination cases, the county in which a Michigan trial or probate court is located in can act as a plaintiff's "co-employer," alongside the court and state itself.[7] *Id.* at 621, 629.

---

[7] *Turppa*'s "co-employer" holding has not been uniformly adopted. In *Housey v. Macomb County*, another judge in this Court noted that *Turppa* "appears to depart from Michigan Supreme Court precedent," and accordingly dismissed a county defendant in a suit brought by a state probate court employee, concluding the county was an improper defendant. *Est. of Housey ex rel. Housey v. Macomb Cnty.*, No. 10-11445, 2012 WL 1694629, at *9 (E.D. Mich. May 15, 2012), *aff'd sub nom. Housey v. Macomb Cnty.*, 534 F. App'x 316 (6th Cir. 2013). The undersigned maintains *Turppa* is consistent with Michigan Supreme Court precedent, which—as discussed *supra* Section III.A.1, only invalidates legislative efforts to classify state court staff as municipal employees. Regardless, when reviewing *Housey* on appeal, the Sixth Circuit did not assess *Turppa*'s validity, and held that county defendant's dismissal was not an abuse of discretion because, in that case, the employee plaintiff did not "bring forth any evidence" that the state probate court delegated hiring and firing power to the county defendant. *Housey v. Macomb Cnty.*, 534 F. App'x 316, 325–26 (6th Cir. 2013). The Western District of Michigan seemingly agrees with *Turppa*'s co-employer holding, recognizing that the analysis of whether a Michigan court staff member is a court or municipal employee "likely must take into account the specific facts and circumstances of the case." *Maat v. Cnty. of Ottawa*, No. 1:12-CV-1194, 2014 WL 1255981, at *15 (W.D. Mich. Mar.

- 22 -

After receiving supplemental briefing, this Court converted Montmorency County's motion to dismiss into a motion for summary judgment and *denied* it, finding the former probate register plaintiff "advanced enough evidence" to substantiate that Montmorency County may have been her co-employer, alongside the probate court—an arm of the state itself.[8] *Turppa v. County of Montmorency*, 724 F. Supp. 2d 783, 785–86 (E.D. Mich. 2010) [hereinafter *Turppa II*]. This evidence included: (1) Montmorency County's "personnel policies" were adopted by the probate court; (2) Montmorency County was involved in decisions concerning the plaintiff's compensation; (3) Montmorency County funded the plaintiff's employment and was identified as the plaintiff's employer on her W-2 forms; and (4) Montmorency County responded as the plaintiff's employer to unemployment inquiries. *Id.* at 788; *see also Turppa I* at 628–29.

---

26, 2014), *aff'd sub nom. Maat v. Cnty. of Ottawa*, 657 F. App'x 404 (6th Cir. 2016). Indeed, the Western District of Michigan has rejected a county-defendant's argument that it was an improper defendant because it did not meet "its burden in proving the absence of a material issue of fact as to whether the county [was] [p]laintiff's employer or co-employer." *Id.* On appeal, the Sixth Circuit seemingly agreed with *Turppa*'s holding and rationale, noting:

> even though [the county-defendant] lacks unilateral authority to dismiss [state trial court staff] under state law, [the county] is responsible for many functions traditionally undertaken by an employer by virtue of authority delegated by the [state] District Court. For example, [state] District Court [staff] receive their paychecks . . . from [the county], which is listed as their employer on federal IRS Form W–2. When applying for jobs with the [state] District Court, applicants must complete and sign an [county] application form that affirms their interest in future "employment with [the] [c]ounty," acknowledges that [the] [c]ounty may terminate the[ir] employment . . . at any time, and requires prospective employees to "agree to [the county's] rules and regulations[.]" Although it appears that all human-resources decisions ultimately rest with the relevant . . . District Court department heads, those department heads regularly consult with [the] [c]ounty's human-resources specialists.

*Maat v. Cnty. of Ottawa*, 657 F. App'x 404, 406 (6th Cir. 2016) (internal citations omitted). In sum *Turppa* has not been overruled, has received favorable treatment in the Sixth Circuit, and is the best precedent to guide the analogous analysis here.

[8] This Court also concluded that the *Turppa* plaintiff did not run afoul of Rule 19 by pursuing her claims only against Montmorency County, and not against the probate court or state itself. *Turppa II* at 792-93 (noting that, because plaintiff sought only money damages and not reinstatement, "complete relief can be afforded" without the present of the court as a party).

The same result here. The record is flush with facts which suggest Defendant Saginaw County operated as Plaintiff's "co-employer" alongside the 70th District Court. Plaintiff's new-hire paperwork, as well the change-of-employment forms she was given when she was promoted were both issued by Saginaw County, not the 70th District Court. ECF Nos. 22-3;. 22-5 at PageID.751. Plaintiff's W-4 identified Saginaw County as her employer, and contained Saginaw County's employer identification number. ECF No. 22-4 at PageID.750. When Plaintiff was notified of her discipline for her chocolate-chip comment, the notice was on Saginaw County letterhead and identified "the County," rather than the court, as the disciplining party. ECF No. 22-11 at PageID.785. The March 2021 Grievance filed by Plaintiff and her union, contesting Plaintiff's discipline, also identified Saginaw County as Plaintiff's employer. ECF No. 22-7 at PageID.758. Plaintiff, Kanisha Jones, Tammy Bieszke, and Kelly Carroll all identify Saginaw County as their employer throughout internal complaints. ECF Nos. 22-13 at PageID.788; 22-15 at PageID.805; 22-17 at PageID.811; 22-20 at PageID.830. Most importantly, Plaintiff and the entire Traffic Division were subject to Saginaw County's personnel policies. *See* ECF Nos. 22-10; 19-3 at PageID.229; 19-4 at PageID.242; 19-13 at PageID.320;19-10 at PageID.303. And April Key, Jennifer Broadfoot, and Robert Belleman—who oversaw all internal district-court complaints and investigations—were Saginaw County Personnel Department staff. *See* ECF Nos. 22-9 at PageID.778; 22-26 at PageID.857.

Defendant ignores these facts and focuses on Plaintiff's collective bargaining agreement, which identifies the 70th District Court as Plaintiff's "exclusive employer," ECF Nos. 19 at PageID.163; 19-36 at PageID.650, 652/ But a collective bargaining agreement does not govern an employer-employee relationship for the purposes of ELCRA, WPA, and § 1983 claims.[9] *Turppa*

---

[9] Defendant additionally argues it is entitled to Eleventh Amendment sovereign immunity on Plaintiff's § 1983 claim. Not so. True, the *70th District Court* is an arm of the state entitled to

*II* at 790 (noting "even if" plaintiff was not a county employee under their applicable collective bargaining agreement, "[p]laintiff may well be an employee of [the] [c]ounty for the purposes of a civil action authorized by the . . . ELCRA"). And one needle suggesting the 70th District Court was Plaintiff's exclusive employer within a haystack of evidence to the contrary does not warrant summary judgment.

Notably, the same conclusion would be reached applying common-law principles of agency or the economic-reality test, both of which are normally applied by courts to determine employer-employee relationships outside the specific, complicated context of Michigan's state court system. *See Turppa II* at 789; *see also Shah v. Deaconess Hosp.*, 355 F.3d 496, 499 (6th Cir. 2004) (noting the differences between these two tests "are minimal").

In the Sixth Circuit, factors guiding these analyses include: (1) the degree of control exercised by the alleged employer over the individual's work product; (2) the skill required to perform the individual's duties; (3) the duration of the parties' relationship; (4) the alleged employer's ability to assign additional tasks; (5) the individual's role in in retaining assistants; (6) whether the work is part of the alleged employer's regular business; (7) the individual's benefits; (8) and the tax treatment of the individual's compensation. *Id.* (citing *Shah*, 355 F.3d at 499–500). Under Michigan law, factors include (1) the alleged employer's degree of control over the individual's duties; (2) compensation; (3) authority to hire and fire; and (4) performance of duties as an integral part of the employer's business toward accomplishing a common goal. *Rakowski v. Sarb*, 713 N.W.2d 787, 793 (Mich. App. Ct. 2006). Courts view the totality of the circumstances

---

sovereign immunity from some constitutional claims. ECF No. 19 at PageID.161–64; *Laborers' Int'l Union of N. Am., Loc. 860 v. Neff*, 29 F.4th 325 (6th Cir. 2022); *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752 (6th Cir. 2010)). But Plaintiff did not sue the 70th District Court. Plaintiff sued Defendant County of Saginaw, which does not enjoy Eleventh Amendment sovereign immunity. *Alkire v. Irving*, 330 F.3d 802, 811 (6th Cir.2003).

and do not weigh any one factor different than another. *Turppa II* at 789.

Here, this multifactor analysis suggests a division of responsibility over Plaintiff's employment. Although the record before the Court suggests Plaintiff's duties were established and overseen by the 70th District Court, which also controlled and monitored her work product, *see* ECF No. 22-6; Saginaw County seemingly compensated Plaintiff and taxed her income. ECF No. 22-4 at PageID.750. And although the 70th District Court likely has the exclusive authority to hire and fire its staff, Saginaw County's Personnel Department plays a significant role in informing these decisions. The County's Personnel Department received and oversaw every internal complaint filed by and against Plaintiff in this case. Indeed, the County—and its retained investigator—investigated Plaintiff's chocolate chip comment, concluded the comment and Plaintiff's subsequent apology violated Saginaw County Personnel Policy, and recommended Plaintiff's discipline accordingly. *See* ECF Nos. 19-8 at PageID.282–83; 19-14 at PageID.326.

In sum, despite Michigan Supreme Court precedent that the state legislature cannot classify state court staff as employees of the county or city the court is located in, such municipalities, in certain factual circumstances, may properly be considered a "co-employer" of a plaintiff pursuing employment discrimination claims. *Turppa I* at 628–29; *see also Turppa II* at 787 ("[T]he inquiry into whether the county, the court, or both were Plaintiff's employers depends more on how the county and court were actually managed than on conclusory statements by the state legislature, the county board, or even the Michigan Supreme Court.") Such is the case here. There is a genuine dispute of material fact as to whether Defendant Saginaw County employed Plaintiff and, thus, Defendant is not entitled to summary judgment on this threshold issue alone.

### B. Fourteenth Amendment Discrimination—42 U.S.C. § 1983

Onto the merits. In Count I, Plaintiff alleges Defendant discriminated against her on the

basis of her race by constructively discharging her, in violation of the Fourteenth Amendment's Equal Protection Clause and 42 U.S.C. § 1983. ECF No. 1 at PageID.10–15. But this Count will be dismissed because Plaintiff has not shown a prima facie case of discrimination necessary to establish a Fourteenth Amendment violation and has not satisfied her obligations to assert municipal § 1983 liability under *Monell*.

### 1. Underlying Constitutional Violation

The Fourteenth Amendment Equal Protection Clause prohibits public employers from discriminating against their employees on the basis of race. *Blick v. Ann Arbor Pub. Sch. Dist.*, 516 F. Supp. 3d 711, 721 (E.D. Mich. 2021). Importantly, "a plaintiff asserting a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983 must prove the same elements required to establish a disparate treatment claim under Title VII of the Civil Rights Act of 1964." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000); *see also Blick*, 516 F. Supp. 3d at 721–22.

Under the first stage of the applicable *McDonnel Douglas* burden shifting framework, Plaintiff must first establish a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). But the Parties dispute the specific elements Plaintiff must show to establish her prima facie case.

In most discrimination claims brought by employees who are members of a racial minority, a plaintiff establishes a prima facie case of discrimination by showing she (1) was a member of a protected class; (2) was qualified for the job she had; (3) suffered an adverse employment action; and (4) was treated differently than similarly-situated non-minority employees. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)

But these elements are modified when the plaintiff is a member of a racial majority. *Leavey v. City of Detroit*, 467 F. App'x 420, 424 (6th Cir. 2012); *Murray v. Thistledown Racing Club, Inc.*,

770 F.2d 63, 67 (6th Cir. 1985); *see also Hahn v. Gasper, No. 1:20-CV-403, 2021 WL 9666846, at \*8 (W.D. Mich. Dec. 27, 2021), aff'd sub nom. Caldwell v. Gasper*, No. 22-1031, 2022 WL 16629161 (6th Cir. Nov. 1, 2022). In these circumstances, a plaintiff establishes a prima facie case of "reverse" racial discrimination by showing (1) "background circumstances exist to support the suspicion that the defendant is the unusual employer that discriminates against the majority;" (2) that she was qualified for the job she had; (3) that she suffered an adverse employment action; and (4) she was treated differently than similarly situated employees of a different race. *Leavey*, 467 F. App'x at 424; *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008*); Toth v. City of Toledo*, 480 F. App'x 827, 832 (6th Cir. 2012).

Defendant argues the modified "reverse discrimination" framework applies. ECF No. 19 at PageID.164. Plaintiff disagrees. ECF No. 22 at PageID.681–83. Although Plaintiff recognizes relevant elements are modified in reverse discrimination claims brought under *Title VII*, she argues the elements should not be modified in the context of a *§ 1983 claim*. ECF No. 22 at PageID.681–82.

But binding Sixth Circuit precedent compels the opposite conclusion. *Golden v. Town of Collierville*, 167 F. App'x 474, 479 (6th Cir. 2006) ("We analyze § 1983 equal protection claims under the framework governing Title VII discrimination claims."); *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000). Indeed, the Sixth Circuit routinely applies the modified "reverse" discrimination framework when analyzing discrimination claims brought by majority plaintiffs alleging violations of the Fourteenth Amendment couched in § 1983 claims. *See, e.g.*, *Toth v. City of Toledo*, 480 F. App'x 827, 832 (6th Cir. 2012); *Leavey v. City of Detroit*, 467 F. App'x 420, 424 (6th Cir. 2012); *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008); *Golden*, 167 F. App'x at 479; *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003). True,

as Plaintiff notes, the Sixth Circuit has suggested "serious misgivings" about imposing more onerous standards on claims brought by one race than another. ECF No. 22 at PageID.682 (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801, n. 7 (6th Cir. 1994) and *Zambetti v. Cuyahoga Cmty. Coll*., 314 F.3d 249, 257 (6th Cir. 2002)). But, regardless of the "misgivings" the Sixth Circuit may have had over twenty years ago, it continues to analyze reverse discrimination claims using the modified framework discussed above. This Court will do the same.

### a. Saginaw County's Background Circumstances

To establish a prima facie case of reverse discrimination, Plaintiff must first show "background circumstances to support the suspicion that [Saginaw County] is the unusual employer that discriminates against the majority." *Toth v. City of Toledo*, 480 F. App'x 827, 832 (6th Cir. 2012). Plaintiff has not done so, here.

The Sixth Circuit has explained that "background circumstances" supporting a suspicion that an employer discriminates against the majority may include: (1) an employer's "history of improperly considering race as a factor in employment-related decisions;" (2) a "workforce [] predominantly comprised of minorities;" or (3) that "the person in charge of making employment decisions is a [racial] minority." *Id.* at 832–33.

Plaintiff has not alleged—and has not presented any supporting evidence to demonstrate an issue of fact—that Saginaw County had a history of improperly considering race as a factor in employment. Plaintiff—a white woman—worked within a predominantly white workforce. Kanisha Jones and Valerie Baker—both of whom filed internal complaints against Plaintiff—are both Black women. ECF No. 19-3 at PageID.201, 230; 19-27 at PageID.387. Judge Clark is a Black man. ECF No. 19-3 at PageID.200. But Plaintiff and Kelly Carroll are both white. ECF No. 19-3 at PageID.200, 218, 231. And, importantly, Linda James, Judge Fichtner, Tobin Dust,

Jennifer Broadfoot, and Robert Belleman—the individuals responsible for investigating and disciplining Plaintiff for her chocolate-chip comment and apology—are white, as well. ECF No. 19-3 at PageID.200, 218, 231.

The *only* "background circumstance" Plaintiff identifies and alleges might suggest Defendant Saginaw County discriminates against white employees is the general "societal context" at the time Plaintiff was disciplined for her chocolate-chip comment. ECF No. 22 at PageID.684. Plaintiff notes that the "'chocolate chip cookie' investigation occurred after the George Floyd murder . . . and the Black Lives Matter protests across the country." *Id.* This Court recognizes the significant societal and racial reckoning prompted by the murder of George Floyd. *See* Bryan Borodkin, *Officer-Created Jeopardy and Reasonableness Reform: Rebuttable Presumption of Unreasonableness Within 42 U.S.C. § 1983 Police Use of Force Claims*, 55 U. Mich. J.L. Reform 919, 932 (2022) (discussing how George Floyd's murder and the Black Lives Matter movement shifted societal perceptions on race and accountability). But how does this national movement, acknowledging the history of racism and oppression felt by Black Americans, support a suspicion that *Saginaw County* discriminates against *white* employees? Plaintiff points to two facts in attempt to connect these dots.

First, Plaintiff points to a webinar on racism that Judge Clark required her to attend and argues this "depict[ed] and insinuate[ed] Plaintiff was like the various white police officers responsible for countless African Americans' deaths, specifically those who kneel at the necks of individuals." ECF No. 22 at PageID.684. But this argument misstates the factual record. True, Judge Clark required Plaintiff to attend a webinar and Plaintiff noted it depicted "people kneeling on people's necks." ECF No. 19-3 at PageID.212. But Plaintiff admits her attendance at the webinar was "prompted by" and "came right after" her suspension for harassing Black coworkers

on the basis of their race. ECF No. 19-3 at PageID.231. Nothing in the record suggests Judge Clark's request that Plaintiff's attend the racism webinar was *discriminatory*.

Second, Plaintiff points to the fact that her internal complaint was not fully investigated but complaints filed by Black employees were. ECF No. 22 at PageID.684. But the record on this point is clear: Plaintiff's internal complaint was not fully investigated because (1) Plaintiff emailed Saginaw County's Personnel Department asking if she could withdraw her complaint, ECF No. 19-13 at PageID.415; and (2) voluntarily resigned less than one month later. ECF No. 22-28; *see also* ECF No. 19-10 at PageID.305 ("[W]e had wanted to investigate the complaint. But [Plaintiff] pulled the complaint."). Indeed, before Plaintiff asked if she could withdraw her complaint, Saginaw County Personnel Specialist April Key referred the complaint to Tobin Dust, just like she had done for all complaints filed by Black employees. *See* ECF No. 19-32.

Thus, even when the record is viewed in a light most favorable to Plaintiff and considered in the broad societal context at the time, no facts support a suspicion that Saginaw County discriminates against its white employees. Although Plaintiff has not established the first element of prima facie reverse discrimination required for her § 1983 claim, this Court will continue to address the other elements for completeness and because the proceeding analysis applies to Plaintiff's ELCRA and WPA claims discussed *infra* Sections III.C–E.

### b. Plaintiff's Qualification

Turning to the second element of prima facie reverse racial discrimination, the Parties do not dispute that Plaintiff was well-qualified for her position as Traffic Supervisor. Nor could they. Plaintiff received excellent reviews in her early annual evaluations and was generally considered to be a competent employee. ECF No. 22-6 at PageID.752–57.

### c. Adverse Employment Action

The third element Plaintiff must prove to establish a prima facie case of reverse discrimination is that she suffered an adverse employment action. Plaintiff—who resigned as Traffic Division Supervisor effective February 3, 2022—alleges that Defendant took adverse employment action against her by "constructively terminating" or discharging her employment. ECF No. 1 at PageID.9, 12, 16, 19, 22. But constructive discharge is a demanding standard, and the factual record presented by the Parties does not plausibly satisfy it.

An adverse employment action is "defined as a materially adverse change in the terms or conditions of employment." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (internal quotations omitted). Examples include "a significant change in employment status," such as hiring, firing, failing to promote, or reassigning an employee to a position with significantly different responsibilities; a decision causing a significant change in the employee's benefits; or constructive discharge or termination. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Laster*, 746 F.3d at 727 (6th Cir. 2014).

"A constructive discharge occurs when the employer, rather than acting directly, *deliberately* makes an employee's working conditions *so intolerable* that the employee is *forced* into an involuntary resignation." *Laster*, 746 F.3d at 727 (internal quotations omitted) (emphasis added). "To establish a claim for constructive discharge, a plaintiff must prove: (1) the employer deliberately created working conditions that a reasonable person would perceive as intolerable, (2) the employer did so to force the employee to quit, and (3) the employee quit." *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 373 (6th Cir. 2024).[10]

---

[10] Plaintiff, citing 2014 Sixth Circuit precedent, argues she can establish constructive discharge by merely showing she resigned after Defendant "act[ed] in a manner so as to have communicated" to Plaintiff that she would have been terminated regardless. ECF No. 22 at PageID.685 (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014)). To the extent this test remains

Plaintiff's constructive discharge claim fails at the first step, as she has presented no evidence that Defendant deliberately created reasonably intolerable working conditions. Whether a reasonable person would consider a plaintiff's working conditions "intolerable" is a fact-specific inquiry, to be analyzed on a case-by-case basis. *Id.* at 728 (citing *Logan v. Denny's, Inc*., 259 F.3d 558, 569 (6th Cir. 2001)). But "intolerability is a demanding standard." *Tchankpa v. Ascena Retail Grp., Inc*., 951 F.3d 805, 815 (6th Cir. 2020) ("Our job is to confirm that the plaintiff's working conditions were hellish, or at least close to it."). Factors relevant to intolerability include: (a) demotion; (b) reduction in salary; (c) reduction in job responsibilities; (d) reassignment to menial or degrading work; (e) reassignment to work under a younger supervisor; (f) badgering, harassment, or humiliation "by the employer calculated to encourage the employee's resignation;" (g) offers of early retirement or continued employment on terms less favorable than the employee's former status, *Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp*., 207 F.3d 776, 782 (5th Cir. 2000)); and (h) sexual assault. *Tchankpa*, 951 at 815.

Plaintiff was not demoted. Her salary was not reduced. Defendant never degraded her duties or assigned her meaningless work. Defendant never offered Plaintiff early retirement nor

---

good law, Plaintiff's constructive discharge claim fares no better applying it, because nothing in the record would have reasonably communicated to Plaintiff that she would be terminated if she did not resign. *See also Burks v. Oklahoma Publ'g Co*., 81 F.3d 975, 978 (10th Cir. 1996) (noting this test is satisfied only when upon a "showing that [the plaintiff] was faced with a choice between resigning or being fired.") True, as Plaintiff emphasizes, Linda James wrote in December 2021 that she and Judge Clark concluded "Plaintiff d[id]n't have the necessary management style or personality to continue as Supervisor" and that she was no longer "a good fit." ECF No. 22-19 at PageID.829. But these notes were internal and nothing suggests they were shared with Plaintiff or any other staff member. Plaintiff also argues Defendant reasonably communicated that she would be terminated when, (1) Linda James told her things "did not look good" in light of Kanisha Jones's "chop chop monkey" complaint and (2) Plaintiff would need to "fight the fight" within the Division. ECF No. 22 at PageID.685. But even assuming Linda James made these statements, assuming they were related to Plaintiff's employment, and assuming Plaintiff interpreted these statements to foreshadow her termination, an "employee's . . . discontent" with "a few isolated" statements does not suffice to show a constructive discharge. *Tchankpa v. Ascena Retail Grp., Inc*., 951 F.3d 805, 814 (6th Cir. 2020).

offered to continue her employment only on unfavorable terms. Plaintiff was not reassigned to work under a younger supervisor and, on the contrary, remained Supervisor of the Traffic Division until the moment she resigned. ECF No. 19-3 at PageID.195. The *only* factor even questionably present is harassment.

Plaintiff points to Kelly Carrol's Facebook Post and the remarks allegedly made by her subordinate employees referring to Plaintiff as "evil, white devil, trash, battle-axe, and bitch" as evidence of harassment and intolerable conditions.[11] *See* ECF No. 22 at PageID.685; *see also* ECF No. 1 at 9. But even if Plaintiff's subordinates referred to her using terms—which her subordinates notably all deny—the comments alone, in this case, are insufficient to create a fact issue as to intolerability. *See Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 708 (6th Cir. 2012) (holding plaintiff did not establish constructive discharge because alleged harassment and disparaging comments from coworkers was "isolated to only a few incidents and by a few individuals and were not pervasive enough to significantly alter her working conditions").

Defendant then argues that Defendant's "failure to investigate or take any action" in response to Plaintiff's *complaint* about these comments constitutes harassment and evidences intolerable working conditions. ECF No. 22 at PageID.685. True, Sixth Circuit precedent suggests that isolated comments made by *employees* which "clearly concern" the plaintiff's race and national origin may satisfy the constructive discharge inquiry if the record reflects the *employer* failed to investigate or mitigate. *See Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 495 (6th

---

[11] Plaintiff also argues her conditions were intolerable because the discipline she received for her chocolate-chip comment "branded her a racist" within her department. ECF No. 1 at PageID.9. But Defendant's discipline—after Defendant investigated and concluded Plaintiff violated County Personnel Policy—cannot reasonably be considered harassment in the first instance. Defendant followed County procedure in investigating and disciplining Plaintiff for her "chocolate chip" comment and subsequent "apology," *see* ECF Nos. 19-11; 19-12, and nothing in the record suggests Defendant did so with an intent to "brand Plaintiff a racist" or encourage her resignation, which did not occur until eleven months later.

Cir. 2017) (finding question of fact as to intolerability because plaintiff, a Chinese nurse, alleged coworkers made racially-charged comments and that, "[w]hile management did not make those comments, viewing the evidence in a light most favorable to Plaintiff requires the finding that management failed to investigate the comments when [p]laintiff informed them of such, thus unreasonably failing to respond to coworker harassment"); *Logan v. Denny's, Inc*., 259 F.3d 558, 573 (6th Cir. 2001) (finding question of fact as to intolerability when plaintiff, a Black Denny's employee, alleged coworkers told her "we don't serve grits here" and made other racially-charged comments, plaintiff reported the comments to management, and no investigation or meaningful corrective action was taken). But, unlike this precedent, Defendant *did* investigate Plaintiff's complaint. When Plaintiff filed her internal complaint concerning the "white devil" comments, ECF No. 19-31, her complaint was promptly forwarded to the Saginaw County Personnel Department, who in turn forwarded the allegation for investigation by Tobin Dust, in the exact same manner as Valerie Baker's "chocolate chip" complaint and Kanisha Jones's "chop chop monkey" complaint. *See* ECF Nos. 19-10 at PageID.303, 305; 19-28 at PageID.33.19-32 at PageID.413. And although the investigation was not completed, Plaintiff asked if she could withdraw her complaint less than one month after submitting it, ECF Nos. 19-10 at PageID.305; 19-33, and thereafter resigned. *See* ECF Nos. 19-28 at PageID.393; 22-28.

In sum, nothing in the record suggests *Defendant Saginaw County* harassed or humiliated Plaintiff in a manner "calculated to encourage [Plaintiff's] resignation. *Logan v. Denny's, Inc*., 259 F.3d 558, 571 (6th Cir. 2001). And even if Plaintiff had demonstrated a fact issue on whether she was harassed in this manner, "[t]he occurrence of one" factor "in isolation generally is insufficient to support" a finding of intolerable working conditions to satisfy the first prong of the constructive discharge inquiry. *Gosbin v. Jefferson Cnty. Commissioners,* No. 2:14-CV-2640, 2017 WL

5653503, at *10 (S.D. Ohio Mar. 29, 2017), *aff'd*, 725 F. App'x 377 (6th Cir. 2018).

In sum, even viewing the record in Plaintiff's favor, she has not shown a fact question on the issue of whether Defendant constructively discharged her by "deliberately create[ing] working conditions that a reasonable person would perceive as intolerable," let alone in a manner intended to force Plaintiff to resign. *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 373 (6th Cir. 2024). Thus, Plaintiff has not established an adverse employment action—the third element to establish a prima facie case of reverse discrimination.

### d. Treated Differently than Similarly Situated Employees

To satisfy the fourth and final element of prima facie case of reverse discrimination, Plaintiff must show that she was treated differently than similarly situated employees of a different race. *Leavey*, 467 F. App'x at 424; *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008*); Toth v. City of Toledo*, 480 F. App'x 827, 832 (6th Cir. 2012). She has not done so.

Plaintiff attempts to establish this element by arguing her complaint of racial discrimination—that her subordinates referred to her as a "white devil"—was not investigated in the same manner as the complaints filed by Valerie Baker and Kanisha Jones. ECF No. 22 at PageID.686. But even if the complaints were not handled in the same manner, a conclusion that lacks factual support in the record,[12] Plaintiff is not similarly situated to Baker and Jones.

To be sufficiently "similarly-situated," "the individuals with whom the plaintiff seeks to

---

[12] As explained *supra* Section III.B.1.c, the record reflects Defendant treated all complaints similarly. Plaintiff argues the to the contrary because Jones and Baker did not file their complaints using the official form appended to County Policy, ECF No. 19-11 at PageID.312. ECF No. 22 at PageID.686. But all complaints were similarly received by Defendant's Personnel Department. *See* ECF Nos. 19-10 at PageID.302–04; 19-28 at PageID.397; 22–26. The Personnel Department referred Baker and Jones's complaint to external investigator Tobin Dust. ECF Nos. 19-3 at PageID.200; 19-28 at PageID.397. And the Personnel Department was in the process of referring Plaintiff's complaint to Tobin Dust when Plaintiff resigned. *See* ECF Nos. 22–26 at PageID.857, 19-10 at PageID.305; 19-28 at PageID.393; 19-35 at PageID.644.

compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). But Plaintiff's complaint was surrounded by mitigating circumstances, which distinguish any difference in how Defendant treated it. Jones and Baker did not ask if their complaints could be withdrawn one month after filing them. Plaintiff did. ECF No. 19-33 ("Can I pull my formal complaint? I think it would be best."). Jones and Baker did not resign their employment prior to the conclusion of the internal investigation related to their complaints. Plaintiff did. ECF No. 19-35. Even assuming Baker and Jones were subject to the same standards and ultimate supervisor, they are not similarly situated to Plaintiff to establish a prima facie case of reverse discrimination.

In sum, although Plaintiff was undoubtedly qualified to serve as Traffic Division Supervisor, she has not shown (1) "background circumstances" supporting the suspicion that Defendant discriminated against white employees; (2) that she was constructively discharged—a form of adverse employment action; and (3) that she was treated differently than similarly-situated employees of a different race. Thus, she has not shown a prima facie case of reverse discrimination and this Court need not proceed to the rest of the *McDonnel Douglas* framework. Defendant is entitled to summary judgment on Plaintiff's § 1983 Fourteenth Amendment claim.

### 2. Plaintiff's *Monell* Obligations

Before turning to Count II, it is important to take a step back from the intricate, multi-factored analysis inherent within the underlying Fourteenth Amendment constitutional analysis, and discuss another, more "big picture" reason why Plaintiff's first claim fails as a matter of law. Recall Plaintiff's claim is couched in 42 U.S.C. § 1983, which provides a civil remedy for those

who have had their constitutional rights deprived by a "person" acting "under the color of law."

In *Monell*, the Supreme Court held that municipalities—like Defendant Saginaw County—can be treated as "persons" and subject to § 1983 liability. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). But a municipality *cannot* be liable for § 1983 deprivations merely because they employ someone who deprives someone else of their constitutional rights. *Monell*, 326 U.S. at 691. ("[A] municipality cannot be held liable under § 1983 on a respondent superior theory."). Instead, municipalities are only liable if their "official policies" cause an employee to violate another's constitutional rights. *Monell*, 436 U.S. at 692; *see also Arendale v. City of Memphis*, 519 F.3d 587, 600 (6th Cir. 2008) (analyzing *Monell* requirements when plaintiff pursued a § 1983 race discrimination claim against a city)

Generally, there are four "avenues a plaintiff may take to prove the existence of a [defendant's] illegal policy or custom. The plaintiff can look to (1) the [defendant's] legislative enactments or official agency policies; (2) single actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

Plaintiff opted for the second avenue, and alleged in her Complaint that "the discriminatory actions in question were taken by officials with final decision-making authority[.]" ECF No. 1 at PageID.14. But Plaintiff has not supported this allegation whatsoever throughout discovery or pleadings. To sufficiently show action taken by a final decisionmaker evidences a county "policy" for *Monell* purposes, Plaintiff must show a "deliberate choice to follow a course of action [was] made from among various alternatives by" a specific official "responsible for establishing final policy with respect to the subject matter in question." *Burgess v. Fischer*, 735 F.3d 462, 479 (6th

Cir. 2013) (quoting *Pembaur*, 475 U.S. at 483). But which "discriminatory actions" are at issue? Who are the officials? And what final decision-making authority did they possess? Plaintiff does not say, and nothing in the record provides clarity.

Although this issue was not argued in either Parties' summary-judgment briefing, Defendant is entitled to summary judgment on Plaintiff's § 1983 claim because there is no genuine issue of material fact that Plaintiff has not attempted to satisfy its *Monell* obligations. *See Hunley v. DuPont Auto.,* 341 F.3d 491, 501 (6th Cir. 2003) ("A district court may properly grant summary judgment on grounds not argued in the motion by the parties."); *Hines v. Joy Mfg. Co.*, 850 F.2d 1146, 1150 (6th Cir.1988) ("Where it is clear there is no genuine issue of material fact, a court may properly grant summary judgment on a ground other than that assigned in the motion.").

### C. Elliott-Larsen Civil Rights Act Discrimination

In Count II, Plaintiff alleges Defendant discriminated against her on the basis of her race, in violation of Michigan's ELCRA. ECF No. 1 at PageID.15–19. Generally, ELCRA discrimination claims are analyzed using the same elements as those claims brought under Title VII or § 1983 and the Fourteenth Amendment. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652 (6th Cir. 2012); *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 917 (6th Cir. 2014); *Blick v. Ann Arbor Pub. Sch. Dist.*, 516 F. Supp. 3d 711, 721 (E.D. Mich. 2021) ("The court's analysis in determining the merit of [plaintiff]'s disparate treatment claims under Title VII, § 1983, and the ELCRA is the same."). However, a plaintiff alleging *reverse* discrimination in violation of the ELCRA, "does not have to satisfy the 'background circumstances' prong." *Leavey v. City of Detroit*, 467 F. App'x 420, 425, n. 1 (6th Cir. 2012) (citing *Lind v. City of Battle Creek*, 681 N.W.2d 334 (Mich. 2004)). Under Michigan law, "Plaintiff must only demonstrate that she was qualified for the position, suffered adverse employment action, and was treated differently

than a similarly situated non-Caucasian." *Id.*

Here, as discussed, Plaintiff has not shown a constructive discharge or other adverse employment action, nor that she was treated differently than similarly situated employees of a different race. *See supra* Section III.B.II. Thus, Plaintiff's ELCRA discrimination claim fails as a matter of law, and Defendant is entitled to summary judgment on Count II.

### D. Elliott-Larsen Civil Rights Act Retaliation

In Count III, Plaintiff alleges Defendant retaliated against her by constructively terminating her employment after she submitted her internal complaint alleging her subordinates called her a "white devil." ECF No. 1 at PageID.19-20.

Under the *McDonnell Douglas* burden-shifting framework, to succeed on this claim, Plaintiff must first demonstrate a prima facie case of retaliation by showing (1) she engaged in protected activity; (2) Defendant was aware of Plaintiff's protected activity; (3) Defendant took materially adverse employment action against Plaintiff; and (4) this action was causally connected to Plaintiff's protected activity. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343–44 (6th Cir. 2021). If Plaintiff establishes her prima facie case, the burden shifts to Defendant to proffer a "legitimate, nondiscriminatory reason" for its alleged adverse action. *Id.* at 344 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If proffered, the burden shifts back to Plaintiff to show Defendant's proffered reasoning is pretextual. *Id.*

Similar to her discrimination claim, Plaintiff has not established a prima facie case of retaliation. Although she likely engaged in a protected activity by filing her internal discrimination complaint, which Defendant was indisputably aware of, Plaintiff did not suffer any materially adverse employment action. Again, the only "adverse employment action" Plaintiff asserts is that she was constructively discharged due to intolerable working conditions. ECF No. 22 at

PageID.690. But, as explained *supra* Section III.B.1, Plaintiff's constructive-discharge argument falls flat. For the same reasons Plaintiff could not establish constructive discharge sufficient for her *discrimination* claims, *see infra* Sections III.B.1, she cannot establish that she was constructively discharged for her *retaliation* claims.

Because Plaintiff has not shown a prima facie case of retaliation in violation of the ELCRA, Defendant is entitled to summary judgment on Count III.

### E. Whistleblowers' Protection Act Retaliation

Lastly, in Count IV, Plaintiff alleges Defendant violated Michigan's WPA, MICH. COMP. LAWS § 15.362, by constructively terminating her employment after she complained about her subordinate employees calling her a "white devil." *See* ECF No. 1 at PageID.21–24. To succeed on this Claim, Plaintiff must prove (1) she was engaged in a protected activity as defined by the act; (2) she was discharged or suffered another adverse employment action; and (3) the discharge or adverse action was causally connected to the protected activity. *Truel v. City of Dearborn*, 804 N.W.2d 744, 753 (Mich. Ct. App. 2010); *see also Dorchy v. Fifth Third Bank*, 585 F. Supp. 3d 1021, 1024 (E.D. Mich. 2021).

But, again, Plaintiff was not discharged, has not established that she was constructively discharged, and has not argued she was subject to any other form of adverse employment action. *See supra* Section III.B.1. Thus, even assuming *arguendo* that Plaintiff was engaged in a protected activity when she submitted her internal complaint, her WPA claim fails as a matter of law. Count IV will be accordingly dismissed.

### IV.

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 19, is **GRANTED.**

Further, it is **ORDERED** that Plaintiff's Complaint, ECF No. 1, is **DISMISSED WITH PREJUDICE.**

Further, it is **ORDERED** that Defendant's Motion to Adjourn the Scheduling Order, ECF No. 29, is **DENIED AS MOOT.**

**This is a final order and closes the above-captioned case.**

Dated: June 5, 2024                          s/Thomas L. Ludington
                                             THOMAS L. LUDINGTON